**Eva L. GAUGLER, on behalf of herself and as Executrix under the Last Will and Testament of Raymond C. Gaugler, deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.
April 16, 1962.

Wesley N. Fach, New York City, for plaintiff, Vincent R. Fitzpatrick, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, for defendant, Morton L. Ginsberg, Asst. U. S. Atty., of counsel.

LEVET, District Judge.

This is a civil action arising under the Internal Revenue Code of 1939, §§ 22(a), 22(b) (3), 26 U.S.C.A. (I.R.C.1939) §§ 22(a), 22(b) (3). The Court has jurisdiction of the subject matter and of the parties to this action. 28 U.S.C. § 1346 (a) (1).

The parties have agreed that the claim in question is for $61,482.58 together with interest from the 15th day of March, 1953, and the costs and disbursements of this action. (Pre-trial Order, filed February 13, 1962).

The Court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT
### STIPULATED

1. The plaintiff, Eva L. Gaugler, is a citizen of the United States and until June, 1961 resided in Westchester County which is within the Southern District of New York. She was born May 4, 1892 and was married to Raymond C. Gaugler on November 26, 1914. She does not have a social security number. Her husband, Raymond C. Gaugler, died

a resident of the Village of Larchmont, County of Westchester, State of New York on January 11, 1952, leaving a Last Will and Testament wherein plaintiff was named and appointed Executrix. This Last Will and Testament was duly admitted to probate by the Surrogate of the County of Westchester and letters testamentary were duly issued to the plaintiff, who had qualified according to law on or about January 23, 1952, and the plaintiff has ever since that time acted as such Executrix.

2. Raymond C. Gaugler was born August 3, 1892 and had had approximately thirty-four and one-half (34½) years of service with American Cyanamid at the time of his death. In 1928, he was Comptroller of the Company; in 1929, Treasurer; 1932, Vice President, and 1951, President. The cause of his death was cerebral hemorrhage and his physical condition for the six months prior to his death appeared to be good. His annual compensation for the years 1942–1952 was as follows:

| YEAR | SALARY | BONUS | TOTAL |
|---|---|---|---|
| 1942 | $36,000.00 | $ 23,821.45 | $ 59,812.45 |
| 1943 | 36,000.00 | 33,260.68 | 69,260.68 |
| 1944 | 36,000.00 | 33,458.33 | 69,458.33 |
| 1945 | 36,000.00 | 28,898.73 | 64,898.73 |
| 1946 | 38,500.00 | 42,904.99 | 81,404.99 |
| 1947 | 42,000.00 | 43,922.68 | 85,922.68 |
| 1948 | 42,000.00 | 65,304.00 | 107,304.00 |
| 1949 | 60,000.00 | 93,314.00 | 153,314.00 |
| 1950 | 60,000.00 | 113,255.00 | 173,255.00 |
| 1951 | 74,857,00 | 250,000.00 | 324,857.00 |
| 1952 | 2,272.73 | (1/1/52–1/11/52) | 2,272.73 |

The bonus set forth opposite each year is the amount based on that year's operations although it was actually received by Mr. Gaugler in the subsequent year.

3. The aggregate amount of the aforesaid salary and bonus so paid to or due Raymond C. Gaugler constituted all of the compensation to which he had a legally enforceable right against American Cyanamid Company.

4. Amounts totalling $72,727.27 were paid to the plaintiff in her individual capacity by American Cyanamid Company in the year 1952. This amount is equal to the amount Raymond C. Gaugler would have received in salary had he remained in the employ of the company for the balance of the year 1952.

5. At the time of his death, there were $4,174,966 shares of common stock of American Cyanamid Company outstanding. Three Hundred Six (306) shares were owned by plaintiff and 2,-907 shares by her husband. Neither plaintiff nor her husband held any of the preferred stock of American Cyanamid Company as of January 11, 1952.

6. On January 16, 1952, the following resolution was unanimously adopted by the Executive Committee of American Cyanamid Company:

"RESOLVED: That, for the period commencing January 11, 1952 and ending December 31, 1952, this Company make voluntary payments to Mrs. Eva L. Gaugler, the widow of Mr. R. C. Gaugler, late President of this Company, at the times and equal to the salary which would have been payable to Mr. Gaugler for that period at his salary rate in effect at the time of his death."

7. Pursuant to such resolution, the aforesaid payments totalling $72,727.27 were paid to the plaintiff in her individual capacity. Said payments were deducted from ordinary income on the Federal in-

come tax returns of the American Cyanamid Company.

8. Plaintiff has never owned more than a fraction of a per cent of American Cyanamid's outstanding common stock and has never owned any of its preferred stock. She has never been a director, officer or employee of American Cyanamid, has never rendered any services to it.

9. For the calendar year 1952, plaintiff and Raymond C. Gaugler, by plaintiff, his Executrix, filed a joint income tax return prior to March 15, 1953 with the District Director of Internal Revenue, Upper Manhattan District and paid to said District Director a joint tax of $141,338.82.

9A. The Commissioner of Internal Revenue included in plaintiff Eva L. Gaugler's taxable income for said taxable year the aforementioned $72,727.27.

10. On or about February 9, 1956, plaintiff and Raymond C. Gaugler, by plaintiff, his Executrix, filed with the said District Director of Internal Revenue a claim for refund in the amount of $61,-482.51, or such greater amount as may be legally refundable, together with interest. Thereafter, by registered letter dated September 5, 1957, the Director of Internal Revenue, Upper Manhattan District, rejected the aforesaid claim for refund.

11. In each case of payment to widows of deceased officers and employees American Cyanamid had paid the officer or employee, or his estate, all sums due as salary and bonus for services rendered. (See Schedule "A"—Appendix).

12. No payments were made to the plaintiff on account of the death of her husband under any pension, profit sharing, stock bonus, stock option or similar plan of the American Cyanamid Company, although the Company paid the premiums on $2,000. of a $20,000. policy with Prudential Insurance Co. of America on the life of the decedent, the full proceeds of which were payable and paid to the plaintiff. (Pre-trial Order, filed February 13, 1962).

## OTHER FINDINGS

13. George R. Martin, now director and executive president of American Cyanamid, with one George G. Allen, now deceased, and one Kenneth C. Towe, were members of the executive committee who passed the resolution (Pl. Ex. 1) in January 1952. (SM 7–8, 12).

14. The executive committee had all the powers of the board of directors when the board was not in session. (SM 9).

15. The executive committee decided that the amount that should be given to Mrs. Gaugler would be an amount equal to Mr. Gaugler's fixed salary over a period of the rest of 1952. (SM 14).

16. These payments were made semi-monthly. Deceased had received a salary semi-monthly before. (SM 17).

17. There was no written plan concerning such payments. (SM 24).

18. The committee considered previous payments to widows. (SM 24–25).

19. The minutes of the executive committee contain the following statement:

"He [Mr. Towe] stated that it has been the practice in the event of the death of valued employees and officers with long service with the company to pay, for varying lengths of time, their widows amounts equal to their salaries." (Gov't Ex. A).

20. Mr. Bell, a past president of the corporation, died in the latter part of December 1950, and payments to the widow equal to what Mr. Bell's salary would have been for the balance of 1950 and for the full year of 1951 were authorized by the executive committee. (SM 28).

21. It was stipulated that if an officer familiar with the financial affairs of American Cyanamid were called he would testify "That a payment was made to the widow of J. J. Murray, assistant treasurer, who died on November 25, 1958, and whose annual salary rate as of

the date of his death was $13,500., and that the payment was in the sum of $8,-044." (SM 72).

22. Similar payments were regularly made concerning officers. The following payments were made:

| OFFICER | DATE OF DEATH | AMOUNT OF PAYMENT |
|---|---|---|
| E. V. O'Daniel | 11/ 4/43 | $36,000.00 |
| W. S. Landis | 9/15/44 | 36,000.00 |
| W. B. Bell | 12/20/50 | 64,837.50 |
| R. C. Gaugler | 1/11/52 | 72,727.27 |
| J. J. Murray | 11/25/58 | 8,044.00 |

(Schedule A—Appendix; Findings of Fact "21")

———◇———

23. There was a discussion at the committee meeting concerning Mrs. Gaugler's "period of adjustment" that the committee thought she would go through due to the increased standard of living assumed by her husband when he became president. (SM 21).

24. The president was allowed to charge expenses incurred on behalf of the company to the company and would be reimbursed for such expenses. Such expenses could include entertainment at home. (SM 35–36).

25. There was no actual investigation by the committee of the needs of Mrs. Gaugler. (SM 28–29).

26. The questions and answers to interrogatories Nos. 2, 3 and 5 are as follows:

Q. "2. State whether all or any part of the aforesaid amounts totalling $72,727.27 were paid to the plaintiff specifically to provide for or in view of any living expenses or other requirements or needs which she could not otherwise then meet and found necessary to incur.

Q. "3. If all or any part of such payments were made for such expenses, needs or requirements of the plaintiff, specify in detail the exact amounts and date of each such payment for such reason, and the precise expense, need or requirement for which it was made."

A. "2. and 3. Plaintiff alleges upon information and belief that through personal acquaintance with plaintiff the members of the Executive Committee of the Board of Directors of American Cyanamid Company believed that after the death of Mr. Gaugler Plaintiff would be required to adjust her scale of living to an income substantially less than that income received prior to his death. No attempt was made to investigate in detail the costs of living of plaintiff nor the exact amount of her income and accordingly payments were not made for any specific expenses incurred by plaintiff."

Q. "5. State to what extent, if any, and in what manner the aforesaid living expenses, needs or requirements of the plaintiff were specifically made known to the American Cyanamid Company or to any officers, committee or board thereof, and in what manner any action was taken thereon."

A. "5. See answers to questions 2 and 3."

27. The committee considered the payment to the widow deductible by the company but not taxable to Mrs. Gaugler. (SM 23–24).

28. The parties stipulated that the payment to the widow was charged on the books of the corporation as administration expenses (executive salaries). (SM 64).

29. It was considered by Mr. Martin that the absence of payments "might react in a negative way against the good will of the company as to its treatment of employees * * *." (SM 38).

30. Mr. Martin considered such payments good public relations for if the payments were not made, such news would hurt the reputation of American Cyanamid. (SM 38–39).

31. Failure to make such payments could hurt the company with respect to the general public and respective employees. There is also the possibility of detriment to the company regarding the employment of future executives. (SM 47).

32. The deposition of Kenneth C. Towe is a part of the record before this Court by stipulation of the parties. (SM 62–63).

33. Mr. Towe stated that in regard to the payments in issue "that it would have been most adverse to the company had it become general knowledge that we had cut Mr. Gaugler off without any consideration of his widow * * *." (Pl. Ex. 3, p. 6).

34. The question was asked of Mr. Towe as to whether he felt that there was any benefit to the company in making the payments. Mr. Towe's answer was: "Most emphatically, yes." Mr. Towe then stated: "Having had some knowledge of the summary action that was taken in the cases of employees of other companies and my belief as to how it affected their ability to attract and retain people, I would say it was a very economical expenditure on behalf of American Cyanamid Company to retain its excellent reputation as treating its employees fairly." (Pl. Ex. 3, pp. 10–11).

35. Mr. Towe stated that he felt it was a decided benefit to the company in showing an active consideration for the family of a deceased employee, particularly one who died without notice. (Pl. Ex. 3, p. 11).

36. In answer to the question as to who would react to such payment, Mr. Towe stated:

"A. I have in mind particularly the general atmosphere in which the family of the deceased was living and being exposed and through them, it radiates all over the Metropolitan area; it gets down to Wall Street pretty fast.

\* \* \* \* \* \*

"A. The general appraisal of a company's securities has a lot to do with the management and its attitude toward its employees and the public; that is what I mean." (Pl. Ex. 3, p. 12).

37. Thus, the securities and financial aspects of the company's interest were considered by Mr. Towe when such payments were made.

38. Mr. Towe stated that he took into consideration the humanitarian aspects and the benefit to the company regarding such payments. (Pl. Ex. 3, p. 13).

## ISSUE

The issue to be determined is: "Was the payment of the aforesaid sum of $72,-727.27 to plaintiff intended by the corporation to be a gift to plaintiff." (Pre-trial Order, filed February 13, 1962).

## DISCUSSION

The scope of Section 22(a) of the Internal Revenue Code of 1939 and the effect of Section 22(b) (3) upon this section is clearly expressed in Simpson v. United States, 7 Cir. 1958, 261 F.2d 497, 500, cert. denied, 1959, 359 U.S. 944, 79 S.Ct. 724, 3 L.Ed.2d 677.

"The sweeping scope of § 22(a) is readily apparent. This language was used by Congress to assert in this field 'the full measure of its taxing power', Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 429, 75 S.Ct. 473, 99 L.Ed. 483. The Supreme Court has given a liberal construction to this broad phraseology in recognition of the intent of Congress to tax all gains except those specifically exempted. The importance of the phrase 'gains or profits and income derived from any source whatever' has been too frequently recognied

[sic] to say now that it adds nothing to the meaning of 'gross income', ibid., 348 U.S. 430, 75 S.Ct. 476 [, 99 L.Ed. 483]. While the income taxed is described in sweeping terms, the exemptions are specifically stated and should be construed with restraint. Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477."

Both parties to this action cite Commissioner v. Duberstein, 1960, 363 U.S. 278, 180 S.Ct. 1190, 4 L.Ed.2d 1218, for support. That decision concerned two cases (Duberstein was decided together with Stanton v. United States, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218) involving alleged gifts which the taxpayers contended would be excluded from gross income. Duberstein gave information as to potential customers to a corporation with which he had done business. The information proved helpful and the corporation gave Duberstein an automobile as a present. The Tax Court held that the only justifiable inference was that the automobile was intended as remuneration for services rendered and affirmed the assessment of a deficiency. The Court of Appeals disagreed, but the Supreme Court upheld the Tax Court. The other case involved one Stanton, who, upon the termination of his services for a corporation, was paid $20,000. as a gratuity "in appreciation of the services rendered." Upon the assessment of a deficiency, Stanton paid the tax and sued for its recovery. Judgment in his favor was reversed by the Court of Appeals. The Supreme Court deemed the Findings of Fact of the trial court to be inadequate and remanded the case to that court for further proceedings.

The plaintiff contends that Duberstein did not change principles applied in earlier cases. Plaintiff, to support this view, cites several district court cases where payments to widows were deemed gifts.[1] (Plaintiff's Trial Memorandum, pp. 10–12). The Government asserts that the effect of Duberstein was to "re-interpret the standards to be used in defining the concept of non-taxable gifts." (Government's Trial Memorandum, p. 7). The Government states that it is significant that the Tax Court, which had held that payments to widows were gifts, has since held such payments to be income.[2] (Government's Trial Memorandum, p. 10).

Analysis of Duberstein, supra, reveals the following:

1. The Government suggested that the Supreme Court promulgate a new "test" to serve as a standard for use by the lower courts and the Tax Court. This suggestion was rejected and the Court stated: "We are of opinion that the governing principles are necessarily general and have already been spelled out in the opinions of this Court, and that the problem is one which, under the present statutory framework, does not lend itself to any more definitive statement that would produce a talisman for the solution of concrete cases." (363 U.S. pp. 284–285, 80 S.Ct. p. 1196).

2. In regard to the meaning of the term "gift", the Court pointed out that "The course of decision here makes it plain that the statute does not use the term 'gift' in the common-law sense, but in a more colloquial sense. This Court has indicated that a voluntary executed transfer of his property by one to another, without any consideration or com-

---

1. Rodner v. United States, D.C., S.D.N.Y. 1957, 149 F.Supp. 233; Reed v. United States, D.C., W.D.Ky.1959, 177 F.Supp. 205, aff'd, 6 Cir. 1960, 277 F.2d 456; Cowan v. United States, D.C., N.D.Ga. 1960, 191 F.Supp. 703; Rice v. United States, D.C., E.D.Wis.1961, 197 F.Supp. 223.

2. Estate of Pierpont, 1960, 35 T.C. 65; Est. of W. R. Olsen, 1961, 20 CCH Tax Ct.Mem. 807; Martin, 1961, 36 T.C. 556; Ivan Y. Nickerson, 1960, 19 CCH Tax Ct. Mem. 1508; Mildred W. Smith, 1961, 20 CCH Tax Ct. Mem. 775; Estate of Irving Cooper, 1961, 20 CCH Tax Ct.Mem. 774; Mary Fischer, 1961, 20 CCH Tax Ct. Mem. 318; Est. of Rose A. Russek, 1961, 20 CCH Tax Ct.Mem. 123; Est. of Martin Kuntz, Sr., 1960, 19 CCH Tax Ct. Mem. 1379.

pensation therefor, though a common-law gift, is not necessarily a 'gift' within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 730 [, 49 S.Ct. 499, 73 L.Ed. 918]." (363 U.S. p. 285, 80 S.Ct. p. 1196).

3. The fact that "payment proceeds primarily from 'the constraining force of any moral or legal duty,' or from 'the incentive of anticipated benefit' of an economic nature, Bogardus v. Commissioner, 302 U.S. 34, 41 [, 58 S.Ct. 61, 82 L.Ed. 32], it is not a gift." (p. 285, 80 S.Ct. p. 1196). In the converse, " '[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it.' Robertson v. United States, 343 U.S. 711, 714 [, 72 S.Ct. 994, 96 L.Ed. 1237]." (p. 285, 80 S.Ct. p. 1196)

4. "A gift in the statutory sense, on the other hand, proceeds from a 'detached and disinterested generosity,' Commissioner v. Lo Bue, 351 U.S. 243, 246 [, 76 S.Ct. 800, 100 L.Ed. 1142]; 'out of affection, respect, admiration, charity or like impulses.' Robertson v. United States, supra, [343 U.S.] at 714 [72 S.Ct. 994.]." (p. 285, 80 S.Ct. p. 1197)

5. The most *critical* consideration "is the *transferor's* 'intention.' Bogardus v. Commissioner, 302 U.S. 34, 43 [, 58 S.Ct. 61, 82 L.Ed. 32]. 'What controls is the intention with which payment, however voluntary, has been made.' Id., at 45 [58 S.Ct. 61] (dissenting opinion)." (Emphasis added) (pp. 285–286, 80 S.Ct. 1196, 1197). In footnote 8, the Court states: "The parts of the Bogardus opinion which we touch on here are the ones we take to be basic to its holding, and the ones that we read, as stating those governing principles which it establishes. As to them we see little distinction between the views of the Court and those taken in dissent in Bogardus. * * *" (p. 286, 80 S.Ct. p. 1197).

6. It is clearly stated in Bogardus that "the donor's characterization of his action is not determinative—that there must be an objective inquiry as to whether what is called a gift amounts to it in reality. 302 U.S., at 40 [, 58 S.Ct. 61, 82 L.Ed. 32]." (p. 286, 80 S.Ct. p. 1197).

7. The proper criterion inquires as to what the basic reason for the conduct is in fact. (p. 286, 80 S.Ct. 1190).

8. "The conclusion whether a transfer amounts to a 'gift' is one that must be reached on consideration of all the factors." (p. 288, 80 S.Ct. p. 1198).

9. "Doubtless diversity of result will tend to be lessened somewhat since federal income tax decisions, even those in tribunals of first instance turning on issues of fact, tend to be reported, and since there may be a natural tendency of professional triers of fact to follow one another's determinations, even as to factual matters. *But the question here remains basically one of fact, for determination on a case-by-case basis.*" (Emphasis added) (p. 290, 80 S.Ct. p. 1190).

There have been several opinions regarding payments to widows subsequent to Duberstein. In Cowan v. United States, D.C., N.D.Ga.1960, 191 F.Supp. 703; United States v. Kasynski, 10 Cir. 1960, 284 F.2d 143; Frankel v. United States, D.C., D.Minn.1961, 192 F.Supp. 776, and Rice v. United States, D.C., E.D. Wis.1961, 197 F.Supp. 223, such payments were held to be gifts. Note that Cowan supra, makes no mention of Duberstein.

The Tax Court decision in Estate of Pierpont, 1960, 35 T.C. 65 and cases following (see footnote (2), supra) have held such payments to be taxable income.

Kasynski, supra, interprets Duberstein as standing for the principle that "We take this to mean that no inflexible legal test can be applied in the determination of what is an excludable gift and that every case must stand upon its own facts." (284 F.2d p. 145). It was also pointed out that: "The most critical consideration is the transferor's intention." (p. 146).

The Frankel case, supra, citing Duberstein and Kasynski, sets forth the

proposition that: "No flexible legal test can be applied in the determination of what is an excludable gift for income tax purposes; hence, as such cases arise they must stand on their own facts." (192 F.Supp. p. 778).

In Wilner v. United States, D.C., S.D. N.Y.1961, 195 F.Supp. 786, which was decided subsequent to Duberstein, it was held that whether a corporate employer's payments to an employee's widow were gifts was a material fact issue precluding summary judgment. The Court indicated that the ultimate issue is the intent of the donor to be determined via an objective inquiry as to what in fact was the reason for the payment. Both Duberstein, supra, and Bogardus v. Commissioner, 1937, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32, are cited for this proposition.

The Tax Court in Estate of Pierpont, supra, where it was held that such payments are taxable income, pointed out that Duberstein "went a long way towards bringing the problem back into proper focus, thereby clarifying and developing the law in this troublesome area. [citation omitted]" (p. 67). The Court held that since the statement by the board of directors indicated that the payments were in recognition of services, that such payments were characterized as a continuation of salary, that the payments were made to the widow rather than the estate, that there was no evidence of motivation due to the widow's needs or a sense of generosity, such payments were not intended as gifts. (58 S.Ct. pp. 68–69).

Rice v. United States, supra, criticizes the Tax Court decision in Pierpont and cases following it.

With due regard to the array of cases that have held such payments gifts, and in spite of the Tax Court's view that Duberstein "clarified" and "developed" this area of the law, it is necessary to base this decision upon an analysis of the facts rather than upon any fixed legal principle concerning payments to widows which may reflect merely the expression of another's factual conclusion. It is here necessary to determine the "critical" factor, the intention of the transferor. Such inquiry must be objective and the donor's characterization of his action is not determinative. The basic reason for the conduct must be determined.

The setting of a standard is precisely what the Supreme Court in Duberstein attempted to avoid. The mandate in Duberstein directs a "case-by-case" factual analysis as to what the transferor's intention was when the payment was made. Duberstein indeed emphatically rejected the establishment of a standard in this area of the law. This dominant feature of Duberstein is clearly pointed out in the dissent of Justice Frankfurter, where it is stated: "* * * that it is 'for the triers of the facts to seek among competing aims or motives the ones that dominated conduct.' [citation omitted]." (363 U.S. p. 296, 80 S.Ct. p. 1202).

The Supreme Court in Duberstein was aware of the problems that this approach might cause but stated: "This conclusion may not satisfy an academic desire for tidiness * * *. But we see it as implicit in the present statutory treatment of the exclusion for gifts, * * *. If there is fear of undue uncertainty or overmuch litigation, Congress may make more precise its treatment of the matter * * *."

A brief review of the facts clearly indicates that here there was no intention to make a gift. The amount decided upon equalled Mr. Gaugler's salary. The payments were made at times when the deceased would have received his salary had he been alive. This was clearly expressed in the resolution which provided that the payments would be made "at the times and equal to the salary which would have been payable to Mr. Gaugler for that period at his salary rate in effect at the time of his death" (Finding of Fact No. 6). Note that payments to Mr. Bell, a past president of the corporation, were equal to what his salary would have been for the authorized period.

There was no investigation of Mrs. Gaugler's needs, costs of living, or the amount of her income. The needs or re-

quirements of plaintiff were not known to the committee when the resolution was made.

The payments were deducted from ordinary income on the Federal income tax returns of American Cyanamid Company. The committee considered the payments deductible by the company. Accounting-wise the payments were charged on the books of the corporation as administration expenses.

There was no *written* plan concerning such payments. However, the committee considered previous payments in reaching its decision. The minutes of the executive committee stated that "it has been the practice in the event of the death of valued employees and officers with long service with the company to pay, for varying lengths of time, their widows amounts equal to their salaries." (Finding of Fact No. 19). Such payments were regularly made to officers. This is clearly expressed in Finding of Fact 22.

The record clearly expresses the intention of two of the three members of the committee who passed the resolution. Mr. Martin stated:

(a) The absence of payments "might react in a negative way against the good will of the company as to its treatment of employees * * *." (Finding of Fact No. 29).

(b) Failure to make such payments would hurt the reputation of the company.

(c) Failure to make payments could hurt the company with respect to the general public and respective employees.

(d) There is a possibility of detriment to the company regarding the employment of future executives.

Mr. Towe stated:

(a) "that it would have been most adverse to the company had it become general knowledge that we had cut Mr. Gaugler off without any consideration of his widow * * *." (Finding of Fact No. 33).

(b) There would be an effect on the ability to attract and retain people and thus it was an *economical expenditure* on behalf of American Cyanamid Company to retain its excellent reputation regarding treatment of employees.

(c) That it was a decided benefit to the company to show an active consideration for the family of a deceased employee.

(d) That there was considered the reaction on "Wall Street" in regard to the fact that the general appraisal of a company's securities is affected by the attitude of management towards its employees.

(e) That the security and financial aspects were considered.

(f) That the benefit to the company was considered.

It is obvious that the above payments did not proceed from a detached and disinterested generosity growing out of affection, respect, admiration, charity, or like impulses. The impetus or the intent that gave rise to these payments was the result of anticipated economic benefits as well as the impelling force of a moral duty. To decide otherwise would be a complete disregard of the facts in this case.

The resolution contains the words "voluntary payments". This is not critical for the donor's characterization of his action is not determinative.

There is evidence to the effect that the committee discussed Mrs. Gaugler's "period of adjustment" that the committee thought she would go through due to the increased standard of living assumed by her husband when he became president. In addition, Mr. Towe stated that he took into consideration the humanitarian aspects of such payments. Certainly, this Court does not doubt that these factors were considered by the committee. However, in view of the prior discussion of the existing factual situation, I conclude that the dominant reason or basis of the action taken by the committee was based on economic and moral factors.

In Simpson v. United States, supra, the Court concluded that payment was pursuant to an established plan consist-

ently followed and that adherence to the plan demonstrated that these payments to widows were made for the purpose of encouraging living executives to continue in their employment and that it was to the interest of the corporation that they did not depart and take with them their training and experience in the company's affairs, developed during a long period of employment there. It was held that the plan was a means of retaining a valuable asset as long as possible. The Court asserted:

"While the resolution of 1950 attempted to protect the company from any legal obligation to make payments, it clearly imposed a moral obligation. As a practical matter, the company had to pay taxpayer in order to preserve its integrity in the eyes of the other executives whose wives were to receive similar payments in the future, and it never in fact tried to revoke the resolution or refused to make payment under it. In any event, legal obligation to pay is not necessary to characterize a payment as compensatory. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 730, 49 S.Ct. 499, 73 L.Ed. 918. The important consideration is that the payment was made in pursuance of an established plan, which was just as effective as an incentive to induce executives to remain with the company as any legal undertaking on the part of the company to make such payments. Bausch's Estate v. Commissioner, supra [2 Cir. 1951, 186 F.2d 313]." (261 F.2d at p. 501).

It was stated in Bounds v. United States, 4 Cir. 1958, 262 F.2d 876, that, "It can be seen that payment to a widow pursuant to a long-established plan, although legally unenforceable, tends to overcome the gratuitous nature of the transaction." (p. 881). It was pointed out that courts that have treated payments to widows as compensation have been influenced in a large measure by the employer's established practice to provide for widows of deceased executives.

However, in Bounds, the element of a long-established plan was absent.

Packard v. United States, D.C., S.D. N.Y.1959, 179 F.Supp. 508, emphasized the effect of a plan and observed that: "In attempting to ascertain this intent, the courts have placed considerable reliance on the presence of a plan or policy in the past of making similar payments." (p. 513).

One of the factors considered in Bausch's Estate v. Commissioner of Internal Revenue, 2 Cir. 1951, 186 F.2d 313, was that "it had become a practice of the company to recompense the estates or dependents of deceased founders." (p. 314).

The plaintiff cites Rodner v. United States, D.C., S.D.N.Y.1957, 149 F.Supp. 233, 236. There the Court wrote:

"It is suggested that the fact that, in the case of every married executive who died between 1946 and 1952, a payment was made to his widow proves a custom and that the custom had refined into a sort of pension plan. That must mean that, while the first few payments were gifts and therefore non-taxable, a point was finally reached where the later payments were in satisfaction of a legal obligation. This seems little more than an appeal to that weakness in human nature that, when a privilege is often enough extended, comes to regard it as a right. However that might be under different circumstances, it is impossible to spell out an enforcible plan here because no pattern as to the amount of payments is apparent."

In this case, however, there exists a plan or policy of making payments to officers. The Findings of Fact show that prior payments were considered by the committee. The minutes of the committee indicate the existence of such practice and point out that payments consisted of amounts equal to the appropriate salary involved. Furthermore, these payments were regularly made to officers.

Note, that Bausch's Estate, supra 186 F.2d at 314, observes that one of the factors considered was that "the payments were measured by the salary paid each decedent during the year prior to his death."

The Rodner case, supra, found it impossible to find a plan since there was no pattern as to the amount of payments. The minutes of the executive committee in the instant case expresses a guide or standard regarding the amount of payments.

The Government contends that the presence of a formal or informal plan or policy indicates the intent of the donor. (Gov't. Trial Memorandum, p. 11).

Plaintiff relies upon the Rodner case, supra, but states that "the only significance of the payments made in the Rodner case, or in the case at bar, is as a factor to be considered in ascertaining whether or not there was an intent on the part of the corporation to make a gift." (Plaintiff's Trial Memorandum, pp. 10–11).

Without attempting to resolve any possible conflict between the plaintiff's interpretation of Rodner and the Government view of the existence of a plan or policy as expressed in the cases of Packard, Simpson, Bounds and Bausch's Estate, and by following the plaintiff's assertion that such payments should be considered in determining intent, it is clear that the history of payments present in this case is incongruous with the intention to make a gift.

In Simpson v. United States, supra 261 F.2d at 501, it is stated that:

"If this payment were a gift its only purpose could have been to help the widow of a deceased executive. Its amount would have been measured in the light of the needs of the widow. However, that was not the measure applied in making the payment. It represented a sum previously fixed and equal to the hus-band's salary for nine months, without consideration of the current needs of the recipient. Bausch's Estate v. Commissioner, 2 Cir., 1951, 186 F.2d 313; Poorman v. Commissioner, 9 Cir., 1942, 131 F.2d 946; Willkie v. Commissioner, 6 Cir., 1942, 127 F.2d 953."

A similar observation was made in Fisher v. United States, D.C., D.Mass. 1955, 129 F.Supp. 759, 761, where there was no evidence that there was anything in the widow's economic situation that would lead the board to make her a gift. This lack of evidence of motivation as a result of the widow's needs is asserted in several other cases.[3]

The needs of a widow may be one of several motivating factors and it does not follow that corporate gifts can be made only to the needy. Rice v. United States, 197 F.Supp. supra at 227. However, "While financial plight, known to the donor, is not an indispensable element of very true gift, it does indeed supply strong evidence in support." Est. of Julius B. Cronheim, 1961, 20 CCH Tax Ct.Mem. 1144, 1147.

I do not intend to set forth a rule which would serve as a guide as to the weight to be given to the "needs of the widow" as a motivating factor. In this case, the failure to investigate is just one part of a factual picture that leads to the determination of intent.

The theory that the concept of a gift is inconsistent with a payment being a deductible business expense was one of the propositions that led to the Government's proposed test in Duberstein. The Supreme Court stated that "it is doubtless relevant to the over-all inference that the transferor treats a payment as a business deduction * * *." (363 U.S. p. 287, 80 S.Ct. p. 1198). It added that such inferences cannot be stated in absolute terms. The issue is the intent of the donor, determined objectively, and the party's expected tax treatment of its

3. Estate of Pierpont, 1960, 35 T.C. 65; Martin, 1961, 36 T.C. 556; Mildred W. Smith, 1961, 20 CCH Tax Ct.Mem. 775; Est. of Julius B. Cronheim, 1961, 20 CCH Tax Ct.Mem. 1144

conduct in itself has nothing to do with the matter. Commissioner v. Duberstein, supra at 286, 80 S.Ct. at 1197.

The deduction of payments from the tax return of the corporation has been considered an evidentiary factor in cases.[4]

It has been said that:

"* * * No one contends that a donor has a right to deduct the amount of the value of a gift when reporting to the government for income tax purposes and such is not the law. Moreover the payments on the corporation's books were entered in an account known as 'Special *Salaries*'. It does violence to language to say that one who intends to make a gift enters the transaction on his books as a salary paid. * * *" Simpson v. United States, supra 261 F.2d at 501.

Bounds v. United States, supra 262 F.2d at 882, points out that numerous cases have held payments to widows constituted gifts even though the payments were treated as deductions in the payor's income tax return. It has been observed that the treatment of such payments in the tax return and books is not conclusive. Fisher v. United States, supra 129 F.Supp. at 761.

However, in this case the treatment on the books and the treatment on the tax returns are merely a part of the overall factual determination, and have not been sole or conclusive factors in establishing intent.

Certain interrogatories which are a part of this record and which concern the financial status of plaintiff were not considered in reaching the decision herein. (Interrogatories 8, 12, 18). It should be noted that such financial condition was referred to in Fisher v. United States, supra 129 F.Supp. at 761; Martin, supra at 559; Mildred W. Smith, supra at 779. This Court does not consider said interrogatories for they do not shed light upon the intention of the donor and are therefore immaterial.

In view of the foregoing, I do not find it necessary to further discuss or factually distinguish the numerous cases decided by lower courts, some of which are cited by plaintiff, involving payments by employers to an employee's widow.

### ADDENDUM

Subsequent to the trial of the case at bar the 4th Circuit vacated the judgment in Pierpont, supra, and the case was remanded. (Poyner v. C. I. R., 301 F.2d 287). There it was reasoned that the decisions in the tax court prior to Duberstein set forth a criterion to determine the dominant motive. It was pointed out that Duberstein did not destroy the authority of earlier tax court cases. It was held that Duberstein did not limit inquiry by the trier of fact solely to the factors recognized by the earlier decisions. The objective is to discover the dominant motive and in the task of sorting out the varying motives, the development of more reliable criteria by the triers of fact should not be curtailed. It was observed that since Duberstein the tax court has considered such factors as the widow's stock holdings and the knowledge of the Board of the widow's financial situation. Chief Judge Sobeloff wrote that *these subjects are relevant and inquiry regarding them as well as any other factors the trier of facts deems helpful is proper*. The underlying reason for vacating the Pierpont judgment was because none of the stipulated facts concerned the additional factors which since Duberstein have been important. The stipulations were made before Duber-

---

4. Fisher v. Commissioner of Internal Revenue, 2 Cir. 1932, 59 F.2d 192, 193 (There is also considered the fact that the payments were charged to the salary account); Poorman v. Commissioner of Internal Revenue, 9 Cir. 1942, 131 F.2d 946, 949; Bausch's Estate v. Commissioner of Internal Revenue, 2 Cir. 1951, 186 F.2d 313, 314; Packard v. United States, D.C., S.D.N.Y.1959, 179 F.Supp. 508, 516–517. (In discussing Bausch's Estate v. Commissioner of Internal Revenue, supra, it was stated that an important factor in determining intent was the fact that payments were deducted from the income tax return of the corporation.)

stein and the Court considered it unfair to allow findings to stand, which are adverse to the taxpayer, because of her silence on matters never deemed pertinent in earlier litigation.

The conclusions reached by this Court in Gaugler do not conflict with the above 4th Circuit opinion. The pre-trial order containing the stipulated facts in Gaugler was filed February, 1962 and Duberstein was decided in 1960. The evidence before the Court was ample and complete. The purpose of this Court, as well as the 4th Circuit, has been to discover the dominant motive of the conduct in question. In accomplishing this end this Court has searchingly analyzed all relevant evidence.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and of the parties to this action.

2. The payments to plaintiff were not intended by the corporation to be gifts. Such payments were motivated by the anticipation of economic benefits as well as the compelling force of a moral duty.

3. These payments did not proceed from a detached and disinterested generosity growing out of affection, respect, admiration, charity or like impulses.

4. The payments in question were not intended as gifts within the meaning of Section 22(b) (3) of the Internal Revenue Code of 1939, 26 U.S.C. § 22(b) (3), and were properly included in plaintiff's taxable income.

5. Defendant is entitled to judgment dismissing the complaint with costs.

Submit final judgment upon notice in accordance with opinion herein.

### APPENDIX—SCHEDULE A

Continuation of paragraph iii, subparagraph 11—

The following officers and employees of AMERICAN CYANAMID COMPANY died during the period 1949 through January 16, 1952 (the date of the authorization of payments to Plaintiff, EVA L. GAUGLER), and payments were made to the widows of these deceased officers and employees only as set forth next to the names of the deceased:

| Employee | Date of Death | Amount of Gratuity |
|---|---|---|
| Rice, E. P., Sr. | 3-25-49 | |
| Foohey, C. A. | 3-29-49 | |
| Franklin, Alfred L. | 3-31-49 | $ 93.75 |
| Sokolowski, B. | 4-7-49 | |
| Kurotchkin, Timothy | 4-21-49 | 110.00 |
| Whitlock, L. E. | 5-12/49 | 1249.98 |
| Cotter, V. M. | 7-8-49 | |
| Sauerhoyer, J. H. | 7-14-49 | |
| Flowers, H. | 7-23-49 | |
| Dobrosky, P. | 7-27-49 | |
| Farley, Vincent J. | 8-15-49 | 1347.50 |
| Kelly, J. M. | 8-27-49 | |
| Murphy, James S. | 8-30-49 | 1725.00 |
| Nagy, C. | 9-7-49 | |
| Ross, M. | 9-16-49 | |
| Black, J. L. | 10-17-49 | |
| Gilbert, Howard F. | 10-17-49 | 3150.00 |
| Mueller, C. J. | 10-17-49 | |
| Roppelt, M. | 10-26-49 | |
| Toltl, J. | 11-11-49 | |
| Klin, E. | 11-13-49 | |
| Demark, L. N. | 12-3-49 | |
| Jacob, John | 12-29-49 | 5400.00 |
| Niles, J. | 1-7-50 | |
| Javick, Harry | 1-31-50 | 3240.00 |
| Creamer, P. G. | 2-11-50 | |
| Brennan, W. M. | 2-16-50 | |
| Van Deursen, A. E. | 2-16-50 | |
| Bellknap, Willard J. | 2-24-50 | 1261.54 |
| Wikoff, H. | 2-25-50 | |
| Scherrer, F. A. | 3-15-50 | |
| Low, A. | 3-20-50 | |
| Santomen, B. J. | 3-27-50 | |
| Hoyt, C. W. H. | 3-29-50 | |
| Greenberg, H. S. | 4-12-50 | |
| Richardson, F. | 4-14-50 | |
| Enlow, William R. | 4-15-50 | 328.16 |
| Lester, Robert E. | 5-6-50 | 1793.48 |
| Massie, J. D. | 5-9-50 | |
| Durant, | | |

| Employee | Date of Death | Amount of Gratuity | Employee | Date of Death | Amount of Gratuity |
|---|---|---|---|---|---|
| Walter W. | 5–15–50 | 2400.00 | Vane, B. | 5–5–51 | |
| Schroeder, A. E. | 6–10–50 | | Montgomery, | | |
| Evans, Joseph R. | 6–13–50 | 3447.50 | L. M. | 5–11–51 | 623.33 |
| Weiser, | | | Ronan, P. J. | 5–18–51 | 8296.88 |
| George F. | 6–14–50 | 1500.00 | Cruse, W. | 5–21–51 | |
| Harmon, M. | 6–16–50 | | Ware, J. W., Jr. | 5–29–51 | 2428.33 |
| Dalverny, F. | 7–12–50 | | Hurley, James G. | 6–10–51 | |
| Petter, Joseph W. | 7–17–50 | 2868.29 | Kelly, H. R. | 6–12–51 | |
| Szaleo, P. | 7–22–50 | | Brogan, T. G. | 6–19–51 | |
| Thomas, W. M. | 7–24–50 | | Pistachio, J. | 6–24–51 | |
| Hazelton, J. | 7–26–50 | | Dorko, A. | 6–25–51 | |
| Dombi, S. J. | 7–28–50 | | Dwyer, Edwin M. | 7–10–51 | 1503.33 |
| Hallback, T. | 7–30–50 | | Hacz, M. | 7–10–51 | |
| Makaluns, P. | 8–15–50 | | Chappel, H. J. | 7–13–51 | |
| Murphy, J. | 9–2–50 | | White, L. M. | 7–15–51 | |
| Koerner, W. F. | 9–13–50 | | Tierney, John J. | 7–16–61 | 1217.19 |
| Beardsky, A. P. | 9–23–50 | 1616.67 | Cesaro, A. | 8–3–51 | |
| Gilman, L. M. | 9–30–50 | | Toal, F. J. | 8–31–51 | |
| Croll, E. J. | 10–5–50 | | Platkin, A. | 9–15–51 | |
| Williams, Clay T. | 10–7–50 | 1317.05 | Scheidle, K. | 9–23–51 | |
| Spikes, L. N. | 10–11–50 | | Grubt, | | |
| Sedlock, S. | 10–12–50 | | George W. | 9–24–51 | |
| Dorn, G. | 11–3–50 | | Jacobus, N. C. | 11–6–51 | |
| Hayes, J. W. | 11–8–50 | | Coffey, R. H. | 11–8–51 | |
| Gray, I. J. | 11–15–50 | | Bearfield, | | |
| Ryan, W. J. | 11–21–50 | | Thomas J. | 11–13–51 | 1050.00 |
| Settle, D. R. | 12–3–50 | | Burgess, F. D. | 11–17–51 | |
| Yurkunas, K. | 12–11–50 | | Winkler, H. S. | 11–24–51 | |
| Carson, A. B. | 12–18–50 | | McIntyre, M. F. | 12–1–51 | |
| *Bell, W. B. | 12–20–50 | 64,837.50 | Segelcke, | | |
| Persurance, G. | 12–23–50 | | John F. | 12–1–51 | 4800.00 |
| DeCamp, L. M. | 1–4–51 | | Freer, E. J. | 12–12–51 | |
| O'Brian, T. F. | 1–7–51 | | King, | | |
| Sutton, R. R. | 1–11–51 | | Anton J., Jr. | 12–23–51 | |
| Williams, A. J. | 1–15–51 | | Fletcher, | | |
| Treen, C. A. | 2–26–51 | | Robert J. | 1–1–52 | 3900.00 |
| Holtzman, | | | Swody, Edward | 1–3–52 | |
| Stephen R. | 3–10–51 | 1500.00 | Marshall, A. W. | 1–4–52 | |
| Wallace, D. J. | 3–10–51 | | Albretton, C. W. | 1–5–52 | |
| Serrell, E. W. | 3–12–51 | 3750.00 | *Gaugler, R. C. | 1–11–52 | 72,727.27 |
| Melton, | | | Alderman, Ivey | 1–13–52 | |
| William O. | 3–12–51 | 1635.25 | Witte, William | 1–16–52 | |
| Wiley, J. A. | 3–16–51 | | | | |
| McDonald, P. E. | 3–21–51 | | | | |
| Lucca, F. P. | 4–12–51 | | | | |
| Burr, A. A. | 4–14–51 | | | | |
| Reynolds, J. B. | 4–27–51 | | | | |
| Heron, C. M. | 5–1–51 | | | | |
| Furiam, J. W. | 5–3–51 | | | | |
| Larkin, R. | 5–4–51 | | | | |

*Officers

In addition to other payments made to employees during the period 1943 through 1948, payments were made to the following officers:

| | | |
|---|---|---|
| E. V. O'Daniel | 11–4–43 | $36,000.00 |
| W. S. Landis | 9–15–44 | 36,000.00 |